**UNITED STATES of America**

v.

**Frank ALPER, Appellant, et al.**

**UNITED STATES of America**

v.

**Frank ALPER et al.**

**Appeal of Stanley M. GREENBERG.**

**Nos. 19366, 71–1318.**

United States Court of Appeals, Third Circuit.

Argued June 21, 1971.

Decided Sept. 14, 1971.

As Amended Nov. 2, 1971.

A. Charles Peruto, Lorch, Ryan, Peruto, Vitullo & Tinari, Philadelphia, Pa., argued for appellants in No. 19366..

John R. McConnell, Philadelphia, Pa. (Thomas M. Kittredge, Morgan, Lewis & Bockius, Philadelphia, Pa., on the brief), for appellants in No. 71–1318.

J. Frank Cunningham, Craig C. Donsanto, Dept. of Justice, Crim. Div., Washington, D. C. (Louis C. Bechtle, U. S. Atty., Washington, D. C., on the brief), for appellee.

Before SEITZ, Chief Judge, and GIBBONS and ROSENN, Circuit Judges.

## OPINION OF THE COURT

GIBBONS, Circuit Judge.

Defendant-appellants Alper and Greenberg were indicted on March 20, 1968. The indictment, in twenty-one counts, charged Alper, Greenberg and one Feiner as defendants in a conspiracy count in which one Hartsock is named as a co-conspirator. 18 U.S.C. § 371 (1964). It charges Alper, Greenberg and Feiner with twenty counts of mail fraud. 18 U.S.C. § 1341 (1964). All three defendants pleaded not guilty and were tried before Judge Lawrence A. Whipple * and a jury in the District Court for the Eastern District of Pennsylvania beginning on March 3, 1970. The conspiracy count and the mail fraud counts all relate to a complicated check kiting scheme involving checking accounts of Alper, Greenberg, Magnum Chemical Corporation, Life Aid Corporation, Trans-Ignition Systems, Inc., Portable Oxygen Corporation and Stellar National Products, Inc. The kite allegedly was run for the purpose of obtaining money from Central Penn National Bank, Industrial Valley Bank, Philadelphia National Bank and Fidelity Philadelphia Trust Company, all of Philadelphia, and Peoples National Bank of Westmont, New Jersey, First National Bank of Stone Harbor, New Jersey, Cherry Hill National Bank, Cherry Hill, New Jersey, Delaware Valley Bank and Trust Company, Cherry Hill, New Jersey and First National City Bank of New York. Checking transactions alleged to have been made in furtherance of the conspiracy began in September of 1963 and continued until June of 1965, when the kite was discovered by some of the banks.

The corporations against whose accounts checks were drawn were all formed at the behest of Alper to carry on a sales business. Greenberg, an attorney, formed each corporation. He became a director of Magnum and of Life Aid. Several of the corporations paid Greenberg $100 a week, from which federal income taxes and Social Security taxes were withheld. These payments continued until late February 1965. One of Alper's corporations furnished

---

* United States District Judge, District of New Jersey, sitting by designation.

Greenberg with an automobile. Feiner was an accountant hired for the corporations by Alper in March of 1965. The co-conspirator, Hartsock, was an officer of Peoples National Bank, and was charged by the government as being instrumental in concealing the existence of the kite from his own and other banks. Hartsock died before the indictments were returned.

The trial lasted from March 3 to April 28, 1970. The prosecution placed in evidence 148 exhibits consisting primarily of bank records, canceled checks, deposit slips, loan ledgers and checking account statements. Alper and Feiner elected not to testify. Greenberg testified at length about his representation of Alper and Alper's corporations. He denied that he had any knowledge of Alper's check kiting. After being charged on April 28, 1970, the jury retired to deliberate at 3:20 P.M. The jury recessed its deliberations at 10:15 P.M. on that date. It resumed deliberations at 9:00 A.M. on April 29, and at 10:35 A.M. advised the court that it had reached a verdict on Alper and Feiner but was hopelessly deadlocked as to Greenberg. Alper was found guilty on all counts. Feiner was acquitted on all counts.

Thereafter the court gave the jury a supplemental instruction and directed that it continue deliberation as to Greenberg. Following this supplemental instruction the jury deliberated for approximately an hour and returned a verdict finding Greenberg guilty on count I, the conspiracy count, and not guilty on all other counts. Motions for a new trial and for a judgment of acquittal were denied by the district court on December 4, 1970, and the defendants were sentenced on March 17, 1971. This appeal followed.

I. Alper's contention that the sentence was excessive.

██ Alper was convicted on twenty-one counts. He was sentenced on count I to imprisonment for five years, and on counts II through XXI to imprisonment for five years to run concurrently with the sentence imposed on count I. He contends that in view of his prior spotless record it was an abuse of discretion for the district court to impose so severe a sentence. The sentence is within the range permitted. 18 U.S.C. § 371 (1964); 18 U.S.C. § 1341 (1964). Alper has made no effort to have brought to our attention the contents of the presentence investigation report on which the district court relied. Our review of the evidence convinces us that the sentence was appropriately within the range of discretion for the district court.

II. The district court's denial of motions for a judgment of acquittal at the end of the government's case and at the end of the entire case.

Both defendants contend that the district court erred in failing to grant their motions for a judgment of acquittal.

Alper contends that the government never proved a specific intent to defraud; rather, that he "tried to take advantage of a common business practice, perhaps in a careless way, which eventually grew out of proportion and backfired on him." [1] Reasonable jurymen could conclude from the evidence that Alper was the chief participant in a check kite from October 22, 1964, to March 30, 1965, between Peoples National Bank and First National Bank of Stone Harbor involving 134 checks totaling over $2,000,000; from April 1, 1965, to June 10, 1965, between First National Bank of Stone Harbor and Industrial Valley Bank involving 335 checks totaling more than $4,500,000; from April 27, 1965, to June 23, 1965, between Fidelity Philadelphia Trust Company and First National Bank of Stone Harbor involving 158 checks totaling more than $3,000,000. There were at least four other kites, and the checks involved totaled approximately $12,000,000. Of the corpo-

---

1. Appellant's Brief, No. 19,366, p. 10.

rations whose checking accounts were used, only the Magnum Chemical Corporation checking account was used for ordinary business purposes. The remaining accounts were used primarily if not exclusively for purposes of the various kites. No useful purpose would be served by a more detailed recital of the evidence. It was clearly sufficient to withstand a motion for a judgment of acquittal and to sustain the jury's verdict against Alper.

Greenberg contends that he was related to Alper and the corporations only as an attorney and that the evidence relied upon by the government is as consistent with his lack of knowledge about and participation in the conspiracy as with guilt. We cannot agree. As with Alper a detailed recital of the evidence would serve no useful purpose. But it could hardly have been proper to grant Greenberg's motion for a judgment of acquittal when the evidence showed that at times when Greenberg, a former director [1a] of several of Alper's corporations, was still on their payroll he drew nine checks on his personal checking account with the Central Penn National Bank in amounts which he then knew were in excess of the account balances payable to Life Aid Corporation, and covered these checks with checks which he then knew were drawn by Alper on a corporate account against uncollected funds. The drawing of three of these checks is alleged as an overt act in the conspiracy count. After Greenberg resigned as a director of the Life-Aid and Magnum corporations, he continued his close business relationship with Alper. He continued to receive and accept weekly payments from Alper's corporations and attempted to help Alper obtain investors and financing. Furthermore, during the time that Alper's corporations were experiencing difficulties with various banks because of overdrafts, Greenberg contacted officials of these banks and interceded on Alper's behalf. From Greenberg's continued close association with Alper, his direct participation in a check kite in the early stages of Alper's manipulations, and his efforts in the later stages to reassure several bankers worried about overdrafts, the jury could reasonably conclude that he was and continued to be a conspirator with Alper in a scheme to defraud. The evidence against him, though not as overwhelming as that against Alper, who played the leading role in this drama of high finance, was clearly sufficient to withstand a motion for a judgment of acquittal and to sustain the jury's verdict against Greenberg. The conspiracy was a matter separate and apart from the substantive offenses. Pinkerton v. United States, 328 U.S. 640, 643, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946); United States v. Pappas, 445 F.2d 1194, 1198 (3d Cir. 1971). After a verdict the evidence in support thereof must be viewed in the light most favorable to the government. United States v. Carlson, 359 F.2d 592, 597 (3d Cir. 1966).

III. The district court's denial of motions for a new trial.

The appellants contend that various trial errors were so prejudicial as to warrant a new trial. We will consider these contentions separately.

A. The contention that the District Judge read the charge to the jury too rapidly.

Appellants contend that the District Judge charged the jury in a sharp, staccato voice and in an extremely speedy manner, so as to make the charge almost incomprehensible. Everyone else in the courtroom, including the court reporter, apparently was able to comprehend the charge. This contention we reject as frivolous.

---

1a. Greenberg resigned from his director's post on June 15, 1963, following his appointment as general counsel for the Pennsylvania Securities Commission and in anticipation of his appointment as a Judge of the Common Pleas in Philadelphia.

B. Greenberg's contention that evidence was erroneously admitted.

The witness Brammer, an officer of the Fidelity Philadelphia Trust Company, testified at trial to receiving a telephone call on July 2, 1965, from a person who identified himself as Stanley M. Greenberg, Alper's attorney. The questions, answers and relevant colloquy are as follows:

"Q. Mr. Brammer, do you recall any telephone conversations with the defendant Stanley Greenberg?

A. I had a call from a party representing himself as attorney for Mr. Alper, or stating that he was Mr. Greenberg, that no one was going to be hurt, and that a loan was being arranged through the Central Penn National Bank, and if there were any difficulties with any additional checks, which we didn't know about at that time, why, it would all be taken care of with proceeds from the loan.

Q. During this conversation was any mention made of Mr. Alper's reputation?

A. I can't—I can't remember anything—

Q. Is there anything in your memorandum that would refresh your recollection?

THE COURT: Can you fix the date when the call allegedly came from a person by the name of Greenberg?

THE WITNESS: I can from my notes. Friday afternoon—" (249a).

At this point there was a side bar conference requested by Alper's attorney in which he asked for an offer of proof with respect to the answer to the question about Alper's reputation. Such an offer of proof was made and Alper's attorney declined to object. Greenberg's attorney did not object. The witness then finished his answer:

"A. Friday afternoon, July 2, 1965—

THE COURT: How about answering the other questions. Can you answer that?

THE WITNESS: Yes.

THE COURT: What is the answer?

THE WITNESS: The answer is, from my notes, I also had an assurance from Mr. Greenberg, attorney for Mr. Alper, that there was no possibility of anyone suffering a loss as Mr. Alper's reputation was above reproach." (251a).

The next day Greenberg's attorney cross-examined Brammer and established that Brammer had not originated the call, and had not previously met or spoken to Greenberg. He then moved to strike the testimony as to the telephone conversation on the ground that the caller had not been properly identified. The government attorney contended, first, that by failing to object timely Greenberg had waived this objection, and second, that the contents of the conversation and the surrounding circumstances sufficiently authenticated the identify of the caller. This colloquy took place:

"[ATTORNEY FOR GREENBERG] I am not aware of any other evidence which identified Stanley Greenberg as the maker of that call.

THE COURT: Not identifying, but circumstances surrounding the making of the call, namely, if the Court's notes are in order, 'After I returned from New York he and I called each other' —Mr. Brammer and Mr. Alper—'and we discussed the Girard check, late return for $2,000. I had a call from the attorney saying he was Greenberg, that no one was going to be hurt, a loan was going to be arranged with Central Penn, and any difficulties would be taken care of by that loan.'" (256a).

The substance of the reassuring call to which Brammer testified relates to prior testimony by the witness Kaelin, an offi-

cer of Central Penn National Bank. Kaelin had testified that on learning of certain overdrafts he had tried to call Greenberg and succeeded in speaking to Alper, who sought to arrange a date at which Alper and Greenberg would discuss a line of credit at Central Penn. Greenberg had thereafter called Kaelin from Harrisburg. Greenberg was advised by Kaelin of the overdrafts, which Kaelin had agreed to permit, for a short time, to a limit of $30,000. Greenberg assured Kaelin that Alper was a responsible person and that things would work out. (127–133a). There was no question of identification respecting the Kaelin-Greenberg telephone conversation. There was ample evidence that Greenberg had on this and other occasions represented himself to be Alper's attorney.

■ The district court properly refused to strike Brammer's testimony about the telephone conversation. One defendant, Alper, before that testimony was completed, asked for an offer of proof. He then declined to object, sensing that the testimony would tend to depict his reputation in a favorable light. Another defendant, Greenberg, not only did not object to the initial question, but after a side bar conference permitted further testimony about the conversation. After overnight reflection Greenberg changed his mind. It would be improper to countenance the practice of withholding a formal objection on the ground of lack of authentication of a telephone caller's identity until after the defendant has had an opportunity to hear and weigh the impact of the testimony.[2]

■ Moreover it is well settled that telephone calls may be authenticated by circumstantial evidence as well as by direct recognition of the person calling. *E. g.*, United States v. Frank, 290 F.2d 195 (3rd Cir. 1961). The circumstances tending to identify Greenberg as the

caller include the facts testified to by Kaelin referred to above, and evidence showing that Greenberg made a very similar call to Egner, another worried banker, at about the same time. In Carbo v. United States, 314 F.2d 718, 743 (9th Cir. 1963), the Ninth Circuit stated the standard which a trial judge should apply in determining whether a telephone conversation has been adequately authenticated:

> "The issue for the trial judge in determining whether the required foundation for the introduction of the evidence has been established is whether the proof is such that the jury, acting as reasonable men, could find its authorship as claimed by the proponent."

Clearly the jury could so find here.

■ Greenberg in his testimony denied the Brammer telephone conversation. The calls to Kaelin and Egner, however, are not disputed. Thus at most the Brammer call is cumulative of other evidence that at a critical period during which the house of cards, or rather of checks, was collapsing Greenberg was reassuring certain worried bankers. We cannot overlook the fact that we are dealing with brief and cumulative testimony in a trial of nine weeks duration presenting voluminous documentary and testimonial evidence. Even if the Brammer testimony should therefore, have been stricken (or more likely additional evidence of circumstantial corroboration required) the error, if any, produced no substantial prejudice and must be disregarded. Rule 52(b), Fed.R.Crim.P.

C. Greenberg's contention that evidence was erroneously excluded.

■■ The district court declined to admit in evidence financial statements marked defendants' exhibits SMG 16 through 22 inclusive relating to Alper's corporations. Greenberg testified at the

2. The witness made it clear in answer to counsel's first question on direct that he did not originate the call, and thus an identification problem arose immediately.

trial that these statements, prepared by a certified public accountant, but bearing a qualified certification, were the only financial data on the corporations made available to him, and showed that Alper's businesses were prosperous and solvent. Although the accountant testified in the trial he was not asked to authenticate the exhibits in question. The government objected to their admissibility on the ground that they had not been properly authenticated and no effort was made to cure that defect. All of the statements except SMG 22 covered periods prior to June 30, 1963, and SMG 22 covered a period ending June 30, 1964. There were over 150 exhibits already in evidence. These unauthenticated statements might have been used by the jury to draw inferences improperly favorable to the co-defendant Alper or might have led to other confusion. Greenberg contends that authentication was not relevant to his reliance on the exhibits. *See* 7 Wigmore, Evidence, § 2132 (3d ed. 1940) and cases cited therein. The district court ruled, however, that in view of Greenberg's testimony that he had received the exhibits and that they showed that the companies were doing a profitable business, admission of the statements themselves would be cumulative.[3] In a multidefendant case involving numerous exhibits the trial judge must be vested with a reasonable discretion to exclude cumulative and possibly confusing evidence. 6 Wigmore, Evidence, § 1907 (3d ed. 1940). The court's ruling was within the bounds of such discretion.

D. Instructions to the jury out of the presence of the defendants.

Both appellants contend that a new trial should be granted because certain communications were received from the jury and certain instructions given while their counsel, but not they, were present.

The jury retired to deliberate at 3:20 P.M. on April 28. Some time thereafter, at a time which does not appear in the record, the court met in chambers with all defense counsel, the Assistant United States Attorneys, and the Clerk, and read to them a note from the jury as follows:

"Sir, 1, can we find each defendant guilty or not guilty on each count? 2, or must each be found guilty or not guilty on all counts?" (613a).

A discussion followed. The record then discloses:

"THE COURT: It is hereby agreed by Counsel that the Court shall answer the inquiries as follows:

'Any defendant can be found guilty or not guilty on each count or any

---

3. The colloquy, in the presence of the jury, was as follows:

"MR. CUNNINGHAM: I object, your Honor, on the ground tat [sic] they were not authenticated as being by Mr. Silverstein as being the product of his company, they are not certified copies of financial statements, and the mere fact that they were received by Mr. Greenberg we don't think makes them admissible.

MR. MC CONNELL: They were identified by Greenberg as having been received by him from the company's account.

THE COURT: I don't recall any testimony pertaining there to the contents of same. Just that these are the only reports he ever received.

MR. MC CONNELL: And that they showed that the companies were going and profitable businesses.

THE COURT: Yes, we had his testimony to that effect. I deny the application of 16, 17, 18, 19, 20, 21, 22 —16 through 22 inclusive.

MR. MC CONNELL: Your Honor, if we may go back for just one minute to these financial statements, these show on their face that they were prepared by Natal, Silverstein & Alloyz, they do contain a certification at the front of each that they were prepared by that company, and the defendant Greenberg testified that he received them from these companies, and this was the only financial information.

THE COURT: And that the companies were going businesses and as he knew they were profitable.

MR. MC CONNELL: As shown by these statements.

THE COURT: I think that's enough for this jury. I don't think they should be admitted in light of Judge Greenberg's testimony." (607–608a).

defendant can be found guilty on all counts or not guilty on all counts.' O.K.?

[GREENBERG'S ATTORNEY]: Just one thing. If you change the word to 'any' in the second half, I don't see it.

[ASSISTANT UNITED STATES ATTORNEY]: Would you call them in, or merely send the reply?

THE COURT: No I will bring them back, or will counsel stipulate that I send it in to them in writing?

[GREENBERG'S ATTORNEY]: If you are just going to give that answer, I say send it in and save time." (614–615a).

The court's answer to the jury's questions was then refined slightly, and the court said:

"THE COURT: Let's send this in. Let the record note I am handing it to my law secretary to bring it up to the marshalls outside the jury room." (616a).

The record does not disclose whether Greenberg and Alper were still in the court house, and there is no indication whatever that they were excluded from the discussions in chambers by any action of the court.

Thereafter at 9:25 P.M. on April 28, all defense counsel and the Assistant United States Attorneys again appeared in chambers and the court read a note from the jury forelady as follows:

"Sir, please send exhibit list." (617a).

The court then obtained from the Clerk an exhibit list and suggested that counsel should look at it to determine if, in the description of the list, anything appeared which might be prejudicial to either side. The attorney for Feiner objected that the voluminous list would not be helpful and that a further inquiry of the jury was in order. The attorney for Alper objected both to furnishing the requested list and to any further inquiry. The attorney for Greenberg agreed that the complete list should be sent to the jury. The Assistant United States At-

torney suggested that the list be furnished, but agreed that further inquiry should be made. The following then appears:

"THE COURT: Whatever they are looking for, we can assist them with the number, whether it be for the government or for the defendant Alper, the defendant Greenberg or the defendant Feiner. I mean this is my own analysis of it because what concerns this Court is this, and frankly, I am very interested in assisting this jury, there are approximately 150 exhibits or 160. I am talking to both sides of this case. And rather than have them go through those exhibits, if I were to send a note back with your consent, counsel, can the Court be of assistance as to any exhibit you are looking for, the Court will designate same gladly—what do you think about that?" (619–620a).

All counsel agreed, and the court sent, to the jury the following note:

"Madam Foreman of the jury, in answer to your inquiry, 'Please send exhibit list,' the Court would respectfully ask in this manner would you please inform the Court what exhibit or exhibits the jury is interested in? Perhaps I can be of assistance" (621a).

All counsel agreed to the text of the note.

At 9:40 the jury returned a note: "Loan ledger cards for S. Greenberg." (621a). These were identified as exhibits G–22A and G–46, and all counsel stipulated that the court send back to the jury the reply: "The Court hereby refers you to Exhibit G–22A and G–46." (623a). It is not disputed that these were the Greenberg loan ledger cards.

As with the in chambers discussion about the verdict, the record does not disclose whether Greenberg and Alper were still in the court house, and there is no indication whatever that they were excluded from the discussions in chambers by any action of the court.

**1232**

The appellants frankly acknowledge that error, if any, resulting from their absence from the discussions in chambers is attributable to the action of their counsel. They contend, however, that it is the right of a defendant to be present at all critical stages of the trial, Rule 43, Fed.R.Crim.P., that this right is of constitutional dimensions, Article III, § 2 and Sixth Amendment, U.S. Constitution, that it is beyond the authority of counsel to waive this right, Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), and that the error was not harmless. Rule 52(b), Fed.R. Crim.P.

■ The government points out that the appellants were given the same opportunity to be present at the meetings in chambers as were their counsel. Counsel for Greenberg reply that counsel were notified to come into chambers, but Greenberg was not so notified either by the court or by counsel.[4] While Rule 43 of the Federal Rules of Criminal Procedure provides that the defendant shall be present at every stage of the trial, that rule adds, "In prosecutions for offenses not punishable by death, the defendant's voluntary absence after the trial has been commenced in his presence shall not prevent continuing the trial to and including the return of the verdict." Here, clearly, is an instance in which trial counsel must be assumed to have implied authority to receive notice of a conference respecting inquiries from the jury. The court was entitled to rely upon counsels' performance of their agency duties and to assume that appellants' absence was voluntary.

Appellants point to United States v. Neal, 320 F.2d 533 (3rd Cir. 1963), as authority for the impropriety of instructing the jury in the absence of the defendant. The *Neal* case involved a supplemental instruction which in the circumstances was highly prejudicial, and a dispute over whether even defend-

ant's counsel was informed. Compare United States v. Grosso, 358 F.2d 154 (3rd Cir. 1965), reversed on other grounds, 390 U.S. 62, 88 S.Ct. 709, 19 L.Ed.2d 906 (1968), applying the harmless error rule to an instruction, in the absence of both defense counsel and the defendant, to continue deliberations. See to the same effect United States v. Schor, 418 F.2d 26, 30 (2nd Cir. 1969). *Cf.* United States v. Crutcher, 405 F.2d 239, 244 (2nd Cir. 1968). The preferred practice obviously is to recall the jury and to deliver supplemental instructions in open court. *See* ABA, Standards Relating to Trial by Jury, § 5.3 and commentary at 139–145 (Tent.Draft, May 1968). Here the court initially offered to follow the preferred practice of returning the jury to open court for instruction, but counsel suggested a more expeditious procedure. In Lewis v. United States, 146 U.S. 370, 374, 13 S. Ct. 136, 36 L.Ed. 1011 (1892), there is dicta to the effect that a defendant may not either by himself or by counsel waive his right to be present. But the very language of the second sentence of Rule 43 recognizes that in some circumstances a trial may proceed in the absence of the defendant. The validity of the *Lewis* dictum must be questioned in view of the subsequent adoption of Rule 43 and of the decision in Illinois v. Allen, 397 U.S. 337, 90 S.Ct. 1057, 25 L. Ed.2d 353 (1970). In the circumstances here presented the court was not in error in relying on the authority of defense counsel to act for their client.

■ Moreover, assuming such reliance to have been misplaced the error was harmless beyond a reasonable doubt. Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Neither communication to the jury is claimed to be erroneous. That the instruction as to the verdict was understood by the jury is demonstrated by its verdict. It acquitted one defendant on

---

4. The record does not disclose whether the appellants were present in the court house to be told of the jury's inquiries and the ensuing conferences. It is entirely like- ly that they had, as is often the case, left the court house vigil to their attorneys.

all counts, convicted one defendant on all counts, and found one defendant guilty on one count and not guilty on twenty counts. The inquiry with respect to the exhibit list and the agreed upon reply can hardly be raised to the dignity of an instruction. The exhibits were in the jury room, and their numbering was a housekeeping detail. Appellant Greenberg urges that with his experience he might have suggested a manner of responding to the inquiry about the exhibits that would have been helpful to him but he does not say what or how.[5] We could not reverse on a ground so entirely speculative.

E. Greenberg's objection to the supplemental charge.

The jury deliberated on April 28, 1970, from 3:20 P.M. to approximately 10:05 P.M., when they retired for the night. Deliberation was resumed at 9:00 A.M. on April 29. At 10:35 A.M. the jury advised the court it had reached a verdict on Alper and Feiner but was deadlocked on Greenberg. It took twenty-five minutes to assemble counsel. The court then advised counsel that it would take the verdicts on Alper and Feiner and would confer with counsel for Greenberg thereafter about further instructions. Greenberg's counsel suggested that the jury be discharged. The court, however, took the verdicts as to Alper and Feiner, and advised the jury that it was considering giving further instructions as to Greenberg. In a colloquy between the court, Greenberg's attorney and the Assistant United States Attor-

ney, Greenberg's attorney continued to assert that the jury should be discharged. The court, however, advised the jury that it would continue deliberating and that it would be instructed further after lunch. Greenberg's attorney continued to object. After hearing argument the court then recessed to draft an appropriate supplemental instruction. It then delivered to the jury a supplemental charge in the form suggested in footnote 32 of the opinion by this court in United States v. Fioravanti, 412 F.2d 407, 420 (3rd Cir. 1969).[6]

To that language it added the sentence:

"Each of you has a duty conscientiously to adhere to his own honest opinion, and there is nothing improper, questionable or contrary to good conscience for a jury finally to remain deadlocked."

In approximately an hour the jury returned a verdict finding Greenberg guilty on count I and not guilty on the other twenty counts.

Greenberg contends that the direction to deliberate further was unduly coercive. Considering that at the time it reported itself deadlocked the jury had been deliberating only seven and a half hours, less time out for meals, and that the trial had lasted nine weeks, we reject this contention. It is true that with the benefit of hindsight the visceral anticipation of Greenberg's attorney as to the outcome of further deliberations was correct. But on the morning of April 29, 1970, for all the court knew a rea-

5. In Greenberg's brief counsel argues, "Were he present, suggestions he might have made regarding the handling of the exhibit list might have resulted in the list being given to the jury, rather than in the attention of the jury being directed at exhibits relating to him." Appellant's Brief, No. 71–1318, p. 34. In fact his counsel made this very suggestion, but later agreed to the procedure actually followed. The attention of the jury was not, by virtue of the court's note, focused on any exhibit. The note was entirely neutral.

6. "It is your duty, as jurors, to consult with one another, and to deliberate with a view to reaching an agreement if you can do so without violence to individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence in the case with your fellow jurors. In the course of your deliberations, do not hesitate to re-examine your own views, and change your opinion, if convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict."

sonable amount of further deliberation might have produced for Greenberg a verdict of not guilty, and have thus spared both him and the government the ordeal of a retrial.

■ Greenberg also contends that when in United States v. Fioravanti, *supra*, this court prohibited further use of the Allen charge it intended to prohibit use even of the charge set forth with approval in that opinion as a supplemental charge. This court did not so intend. There will be cases in which a supplemental charge is appropriate. This was such a case.

F. Greenberg's newly available evidence.

Greenberg contends that because the testimony of Alper and Feiner would now be available and would be favorable he should be granted a new trial. The district court considered this contention and rejected it for reasons which we find cogent.

In support of his motion for a new trial Greenberg presented Feiner's affidavit in which Feiner stated that he would testify as he did before the grand jury which returned the indictments. That testimony was that he had no knowledge of Greenberg's activities. If admissible at a trial at all, such testimony would be of extremely problematical value. Moreover, Feiner did not come into the picture until March of 1965. Thus his knowledge, if any, covers a time much later than that covered by the evidence which is most incriminating against Greenberg: the time when his personal account was used to kite checks with the Life Aid account.

Greenberg also presented Alper's affidavits in which Alper offers to testify that Greenberg had no knowledge of the day to day financial operations of the subject companies except what Alper told him; that he only gave Greenberg financial statements showing profitable business operations; that Greenberg had no access to the corporate financial records; and that Greenberg's only

connection with the companies was in legal representation. The government points out, correctly, that there was no evidence that Greenberg had access to the corporate financial records and that Greenberg testified to the contrary. It urges that the testimony would at best be cumulative of Greenberg's own. Undoubtedly this is so. Such testimony from the mastermind of the plot would also have been helpful, especially if Alper proposed, while attempting to exculpate Greenberg, to admit his own guilt. Alper's affidavits do not go that far. Indeed he contends on appeal that he is not guilty.

■ Assuming, however, that the limited and cumulative testimony which Alper would give would likely be helpful, Greenberg's difficulty is that in the district court he made a tactical decision not to pursue the steps which might have made Alper's testimony available. He made, but later abandoned, a motion for a severance. Had that motion been pursued Alper could have been tried first, and thus have been available to testify. There is no question that the choice to abandon the severance motion was a reasoned tactical decision. Where it is clear that the defendant knew of the existence of evidence and willfully failed to take steps to secure its availability he cannot urge that evidence as a ground for a new trial. Nelson v. United States, 415 F.2d 483 (5th Cir. 1969), cert. denied, 396 U.S. 1060, 90 S.Ct. 751, 24 L.Ed.2d 754 (1970), United States v. Howell, 240 F.2d 149 (3rd Cir. 1956); United States v. Rutkin, 208 F.2d 647 (3rd Cir. 1953); Brandon v. United States, 190 F.2d 175, 13 Alaska 372 (9th Cir. 1951). The situations presented in Newsom v. United States, 311 F.2d 74 (5th Cir. 1962); Ledet v. United States, 297 F.2d 737 (5th Cir. 1962); and Amos v. United States, 95 U.S.App.D.C. 31, 218 F.2d 44 (1954), are not presented by this record.

The judgments of the district court in No. 19,366 and No. 71–1318 will be affirmed.