UNITED STATES of America,
Appellee,

v.

Delmar Roy BURRELL a/k/a Del,
Appellant, et al.

No. 73–1893.

United States Court of Appeals,
Third Circuit.

Argued Jan. 25, 1974.

Decided May 13, 1974.

Richard L. Thornburgh, U. S. Atty., Henry G. Barr, James A. Villanova, Kathleen Kelly Curtin, Samuel S. Orr, III, Asst. U. S. Attys., Pittsburgh, Pa., for appellee.

Thomas R. Ceraso, Greensburg, Pa., for appellants.

Before BIGGS, GIBBONS and GARTH, Circuit Judges.

## OPINION OF THE COURT

BIGGS, Circuit Judge.

The defendant-appellant Burrell was indicted on each count of a three count indictment which alleged a complex scheme involving the theft, transportation and attempted sale of tungsten carbide powder. Burrell's principal contention is that the Government failed to produce any evidence, factual or circumstantial, which was sufficient to sustain his conviction on the second count of the indictment.[1] He was acquitted on the other two counts. Burrell moved for a judgment of acquittal, for a new trial and an arrest of judgment. These were denied and the appeal followed.

The Government's counter statement of the case is an adequate description of what is alleged to have been the basis of the scheme. Burrell and his codefendants "were accused of causing approximately 45,695 pounds of tungsten carbide powder stolen from the Teledyne Firth-Sterling Plant in West Elizabeth, Pennsylvania, on March 13, 1971, to be transported by truck from West Elizabeth, Pennsylvania, to Miami, Florida, where it was repackaged in 34 metal drums; of causing this tungsten carbide powder to be shipped consigned to Paul West to Tortola, British Virgin Islands, via St. Thomas, British Virgin Islands, on March 24, 1971; of causing this powder to be shipped from Tortola to Liverpool, England, via Jamaica on April 22, 1971; of causing 26 of the 34 drums to

1. The judgments of conviction of Grover Edward Hendricks and Edward Thomas Poland, who were tried with Burrell, at our Nos. 73–1894 and 73–1895, respectively, were affirmed by judgment orders of this court filed February 4, 1974, 492 F.2d 1238, 1239.

be shipped to Rotterdam, Holland, on July 30, 1971; of causing the aforesaid material to be stored in these respective places. They are also accused of attempting to market this material." Burrell was charged in Count 2 of the indictment with transporting stolen property of a value in excess of $5,000 in interstate and foreign commerce and in aiding and abetting in the transportation, in violation of 18 U.S.C. §§ 2314 and 2.[2]

Title 18, U.S.C. § 2314 provides in pertinent part: *"Transportation of stolen goods, securities, moneys, fraudulent State tax stamps, or articles used in counterfeiting.* Whoever transports in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud;

\* \* \*

"Shall be fined not more than $10,000 or imprisoned *not more than ten years* or both."

Title 18, U.S.C. § 2 provides: *"Principals.* (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal. (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal."

There is abundant proof of the transportation of the stolen tungsten carbide powder in interstate and foreign commerce; however, Burrell's connection with these activities is less than clear. The district judge agreed that the evidence failed to establish that Burrell transported or caused the transportation of the stolen material in interstate commerce but deemed it sufficient to support his conviction for aiding and abetting the transportation.

In evaluating the sufficiency of the proof of Burrell's association with the venture we are cognizant that it is the law that more than mere presence is required in order to convict. It is also the law that evidence of an act of relatively slight importance may warrant a jury's finding of participation in a crime. United States v. Garguilo, 310 F.2d 249, 253 (2 Cir. 1962); cf. United States v. Barber, 429 F.2d 1394, 1397, n.4 (3 Cir. 1970). Participation may also be shown by circumstantial evidence as well as by direct evidence. United States v. Garguilo, *supra.*

A careful examination of the record and a study of the brief and argument of counsel for the United States sums up all the evidence in respect to Burrell's alleged participation in the conspiracy.

We resume it here: The testimony of Paul West established that Burrell did travel to Tortola in British Virgin Islands in the company of co-defendants Poland and Hendricks in the latter part of April 1971, and it is a fact that he arrived on Tortola on the very same day as the shipment of stolen tungsten carbide powder. At this time arrangements were made between West and Hendricks to ship the material to Europe and a telephone call was made to Arnold Rostan. It was the intention of Hendricks to have Rostan serve as sales agent for disposition of the tungsten carbide; however, this was not mentioned during this initial telephone conversation.

---

2. The second count of the indictment is as follows: "On or about the 13th day of March, 1971, through on or about the 16th day of June, 1971, in the Western District of Pennsylvania and elsewhere, the defendants, Delmar Roy Burrell, Grover Edward Hendricks, and Edward Thomas Poland, did with unlawful and fraudulent intent, transport and cause to be transported in interstate and foreign commerce, to wit, from West Elizabeth, Pennsylvania, to Miami, Florida, and from Miami, Florida, to Tortola, British Virgin Islands, and from Tortola, aforesaid to Liverpool, England certain goods and merchandise of a value in excess of $5,000, to wit, 45,695 pounds of tungsten carbide powder, then knowing the same to have been stolen. In violation of Title 18, United States Code, Sections 2314 and 2."

There is no evidence whatsoever, or at least none is pointed out to us and we can find none, that Burrell was present while this call was made or took any part in it. Additionally, the transcript of the trial at 531 states:

"Q. On direct examination, sir, all you stated was that you saw the two of them [Burrell and Poland] in Tortola at that time, is that correct?

A. That's correct.

Q. And can you tell me, sir, whether or not there was any discussion as to this tungsten carbide or this material in their presence or that they participated in?

A. None that I remember them participating in, no.

Q. None that you recall?

A. No."

It is also shown by West's testimony that in late July of 1971, Burrell was present at a meeting with West in Palm Beach, Florida, at which time co-defendants Hendricks and Poland were also present. At this meeting, an attempted sale of the stolen tungsten carbide powder was discussed in Burrell's presence. West testified at Transcript 489–491, as follows:

"A. I had a meeting with Ed Hendricks at that time.

Q. Where did that occur?

A. Near Palm Beach.

Q. And what was discussed at that time?

A. Well, I told Ed what I had done in England and I told him that the trip was unsuccessful, and I told him that I could not handle this any longer and that I needed some money because my wife had received no money during the time I was gone.

Q. Let me ask you this: Who paid your expenses in going over to Europe with respect to your sales attempts?

A. I paid the expenses. I paid all the expenses on the material.

Q. What did Mr. Hendricks say at that time?

A. Well, he said that he would give me some money as soon as possible and that he or someone else would continue to try to sell the material.

Q. At the time that you met Mr. Hendricks in West Palm Beach or Palm Beach, was anybody with him?

A. Yes.

Q. And who would they be?

A. The two gentlemen sitting here.

Q. Could you indicate them to the jury?

A. Yes, those two gentlemen right there.

Mr. Barr: Okay. Let the record reflect that the witness has indicated the defendants Edward Poland and Delmar Burrell.

Q. Now, when you told Mr. Hendricks that you weren't successful, again, he indicated that somebody else, either he or somebody else would try to sell it, is that correct?

A. That's correct.

Q. Did you give him any information or anything to indicate what companies might be interested in this material?

A. Yes, I gave him the names of the companies which I thought were possible buyers, not the lists of companies that I had called already, but the ones that I either had not called yet or the ones that looked as if they were interested.
* * *

Q. Now, after this meeting with Mr. Hendricks and at which the other two defendants were present, when was your next contact with respect to this material by one of the defendants?

A. I believe it was Mr. Poland called me from someplace in Europe.

Q. And what did he want at that time?

A. He asked if I would authorize him to receive samples of this material from the place where it was stored. . . ."

It is not shown that Burrell had anything to do with the telephoning, nor is it clear that the powder was discussed in his presence as being stolen powder.

If the latter had been shown Burrell might have been charged as an accessory after the fact and concealing the fact that stolen property had been in interstate commerce, but the prosecuting attorney made no attempt to bring such facts upon the record.

The limited extent of Burrell's participation in the meeting was clarified on cross-examination. We quote now from Transcript 564–8:

"Q. And who all was present at that meeting?

A. Mr. Hendricks was there and the two gentlemen here were there.

Q. Was there anybody else there?

A. There was another fellow there.

Q. Another person?

A. Yes, another person.

Q. Do you know that other person?

A. No.

Q. Do you think you would recognize him if you saw him again?

A. I am not sure, but I might.

Q. And can you tell me, I believe you have already testified that you saw Mr. Burrell once, is that correct?

A. That's right.

Q. And this was the second time that you had seen Mr. Burrell, is that correct?

A. That's right.

Q. Did you have any trouble identifying him as one of the persons that you had seen?

A. No. No.

Q. Can you tell me whether or not the conversation that took place at the meeting in mid July was with everyone present, the four people that you have mentioned and yourself, or was it between you and one of those other persons or just who all participated in any discussion with regard to this material?

A. Hendricks and—well, the other two overheard some of it, I am sure, but the discussion was mainly with Hendricks.

Q. They may have have overheard it, is that correct?

A. That's correct.

Q. Did they participate in it?

A. I don't remember.

Q. Now, can you tell me, sir, whether or not your memory with regard to this entire transaction was better a year ago than it is today?

A. Generally, I would say, yes.

Q. And, therefore, sir, approximately one year ago today, on November 15, 1971, when you gave the statement to the United States Attorney, would I be correct that your answers would have been more responsive because you would have had a better recollection at that time?

A. I would think so, yes.

Q. Sir, I would ask you to again look at your statement of November 15, 1971, particularly pages 45 and 46. I am sorry. Start at the bottom of page 44 where I have indicated the first question on that page. Would you look at those three pages, please? Now, sir, again, do you remember being asked those questions and giving those answers on November 15, 1971?

A. Yes, sir.

Q. And were the answers to the questions that were asked of you at that time accurate?

A. As far as I can see, they were accurate, yes.

Q. Would you please, sir, read to the jury, starting with the check on the first question on page 44, over to the check that I have indicated on page 46, to an answer approximately halfway down the page? Would you please read that to the jury and would you again keep your voice up so the jury can hear you?

A. Does the name Edward Poland mean anything to you?

I think he was a friend of Ed, a friend of Ed's.

Q. Will you please keep your voice up a little?

A. All right. Then you met the man?

I met him.

Where did you meet him?

I met him in Miami.

When was that?

When I got back from Europe, I made the trip from Miami to see Ed and tell him what had happened in Europe, and I wanted to tell him I wasn't very successful in selling this material and that I was going to go ahead and write some letters, but he hadn't sent my money like he said he was going to. I really wasn't interested in going on handling this material, and Ed, this fellow Edward Poland was a friend of his, and I met him there one time.

Did he participate in this conversation that you had with Hendricks about the material?

No, but he was there, and there was someone else there whom I don't remember his name. There were two other fellows there.

What were they doing there?

I don't know.

Did they have any connection with this transaction?

They may have, but if they did, I don't know.

Did you ever have any conversation with Poland about the material?

No, I didn't talk with him about it or the other fellows that were with him. You mean in Miami?

Anywhere. . . ."

The strongest item of testimony against Burrell is that he got in touch with Richard Sylvester and suggested Sylvester come to his home to talk about a certain matter. The pertinent testimony of Sylvester, Transcript 946–952, is set out below:

"Q. Now, I direct your attention to early August of 1971 and ask you if the defendant Delmar Burrell contacted you at or about that time?

A. Yes, he did.

Q. And what was the nature of the contact?

A. He asked me to come out to his home and talk to him.

Q. Subsequently, did you go to his home?

A. Yes, I went to his home and there he asked me if I would like to go to Europe.

Q. Okay. Now, who was with you when you went to his home?

A. My girl.

Q. And who was at Mr. Burrell's home?

A. His wife.

Q. And where did this conversation take place?

A. Between Del and I?

Q. Yes.

A. In his cellar.

Q. Okay, and what did he ask you at that time?

A. He asked me if I was available to go to Europe, would I like to go to Europe.

Q. Now, had you been to Europe prior to this occasion?

A. Yes, I had, on two other occasions.

Q. And did you go by yourself on those other occasions?

A. The first time I went by myself and the second time Del and I went together.

Q. When did you go to Europe with Del, to the best of your recollection?

A. To the best of my recollection, 1968, summer of.

Q. And what else did he tell you when he asked if you wanted to go to Europe?

A. He asked me if my passport was still valid and if I needed any shots.

Q. Okay. Did he tell you why he was asking you this?

A. He had a friend that had some business to do.

Q. Did he tell you that friend's name?

A. No.

Q. Did he mention anything about expenses at that time?

A. Yes, I said I would like to go, you know, but I didn't have the money. He said, well, the trip would be paid for and all expenses.

Q. When he said the trip would be paid for, was he referring, what, to transportation or what at that time?

A. I took it to be transportation, you know, and expenses, which would be food.

Q. What did he tell you that you were supposed to do over in Europe with respect to this friend of his?

A. The friend had some business to do. All I was to do would be to make it easier for him to find the places he had to go to and drop him off there and pick him up whenever his business was done.

Q. Did he indicate when this trip was to be made?

A. As soon as possible.

Q. Now, when was your next contact with Mr. Burrell with respect to this trip?

A. A few days later he called and he asked if I was able to go for my passport within the next day or two.

Q. And what did you tell him at that time?

A. Yes, that I would be availalbe.

Q. Did he tell you anything else during that contact?

A. Where I was to meet the people that were going to go along.

Q. And where did he tell you to meet them?

A. Near the turnpike at Irwin.

Q. And subsequently did you meet with them?

A. Yes, I did.

\* \* \* \* \* \*

Q. Okay. And who did you meet there?

A. Bill Altieri and an Ed Poland.

\* \* \* \* \* \*

Q. Now, when you were speaking with Mr. Burrell, your earlier contact with respect to this trip, you indicated that he told you you were just to show a friend of his around.

A. Yes.

Q. Did you indicate to him at all that that sounded a little bit strange?

A. Yes. And he said there is nothing, there is nothing wrong with it; if you are worried about it, just take the party to the door and go have a drink and then come back and pick him up; that there is nothing funny about it."

The only additional evidence relied upon by the prosecution is set out in its brief as follows: [3]

"(d) The government introduced Exhibit 122 which was an application for a passport submitted by defendant Burrell in August of 1971. This application revealed that Burrell intended to travel to England and Holland (where stolen property was located) for 'business' purposes.

"(e) On the weekend after the theft (March 20, 1971) a trailer identical to that used during the theft was observed on property owned or used by the defendant Burrell . . . ."

Upon a reading of the transcript, despite all the favorable inferences that might be drawn therefrom, the proof against Burrell seems exceptionally weak. The fact that Burrell travelled to Tortola in the British Virgin Islands in the company of the co-defendants Poland and Hendricks does not prove that Burrell had any part in the transportation of the stolen powder, albeit the three men arrived at Tortola the same day as the shipment of tungsten carbide powder and that also at this time the arrangements were made for the trans-shipment of the material to Europe. Despite the fact that Burrell was proved to be present at a meeting with West in Palm Beach at which the co-defendants Poland

---

3. Government's Brief, p. 14.

and Hendricks were also present, and the Government brief states, as we have quoted, that the matter regarding the attempted sale of stolen tungsten carbide powder was discussed in Burrell's presence, there is nothing in the record to show that the discussion informed Burrell or made known to him that the proposed sale of tungsten carbide powder was stolen tungsten carbide powder and in particular the tungsten carbide powder which was stolen from Firth-Sterling Company. The same observation can be made respecting all of the conversations relied on by the Government, including the meeting with Sylvester. Items "(d)" and "(e)" quoted above certainly do not help the Government's position.

The application for a passport does not establish knowledge of the theft or intent to aid in the transportation of the stolen material. The testimony identifying a similar trailer at Burrell's place of business is of little moment considering that Burrell was employed in a trailer repair shop and no evidence was introduced purporting to demonatrate that the trailer used in the robbery was in any way unusual.

We are aware of the fact that all inferences are to be taken in favor of the United States when a judgment of conviction has been reached, but to convict upon this testimony is to treat inferences as facts and this we cannot do. We are also aware, as asserted by the Government, that evidence of an act of relatively slight moment may warrant a jury's finding of a participation in a crime, but here the evidence is clearly insufficient to prove guilt beyond a reasonable doubt. Cf. United States v. Barber, 429 F.2d 1394, 1397, n.4 (3 Cir. 1970).

In view of our conclusions, it is not necessary to pass upon the other grounds asserted by Burrell in support of his motion for judgment of acquittal. The judgment of conviction will be reversed and the cause remanded with directions to the district court to enter a judgment of acquittal in Burrell's favor.

GIBBONS, Circuit Judge (dissenting).

I agree with Judge Biggs' statement of the governing law, and I can find no fault with his treatment of the record facts. But while I agree that the proof against Burrell outlined in his opinion is, as he says, exceptionally weak, mindful that after a verdict it must be looked at in the light most favorable to the government, I believe it to be sufficient. *See* United States v. Kenny, 462 F.2d 1205, 1226–1227 (3d Cir.), cert. denied, 409 U.S. 914, 93 S.Ct. 233, 34 L.Ed.2d 176 (1972); United States v. Alper, 449 F.2d 1223, 1226–1227 (3d Cir. 1971), cert. denied, 405 U.S. 988, 92 S.Ct. 1248, 31 L.Ed.2d 453 (1972); United States v. Carlson, 359 F.2d 592, 597 (3d Cir.), cert. denied, 385 U.S. 879, 87 S.Ct. 161, 17 L.Ed.2d 106 (1966). There are just too many coincidences of Burrell being at a critical place at a critical time in the movement of the stolen merchandise. I cannot disregard the cumulative effect of the circumstantial evidence of his involvement. It suggests to me more than that Burrell kept bad company.