

2000 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-13-2000

# United States v. Eastern Med Billing

Precedential or Non-Precedential:

Docket 99-5489

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2000

Recommended Citation

"United States v. Eastern Med Billing" (2000). *2000 Decisions.* Paper 221.
http://digitalcommons.law.villanova.edu/thirdcircuit_2000/221

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2000 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed October 13, 2000

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 99-5489, 99-5490, 99-5491

UNITED STATES OF AMERICA

v.

EASTERN MEDICAL BILLING, INC.
        (Appellant in 99-5489)

UNITED STATES OF AMERICA

v.

JOSEPH PODLASECK
        (Appellant in 99-5490)

UNITED STATES OF AMERICA

v.

DAVID PODLASECK
        (Appellant in 99-5491)

On Appeal from the United States District Court
for the District of Delaware
(D.C. Criminal Nos. 96-cr-00098-4,-5,-6)
District Judge: Honorable Joseph J. Longobardi

Argued March 23, 2000

Before: McKEE and RENDELL, Circuit Judges,
and DEBEVOISE,* Senior District Judge
_____

* The Honorable Dickinson R. Debevoise, Senior United States District
Judge for the District of New Jersey, sitting by designation.

(Filed: October 13, 2000)

Luis M. Matos, Esq. [ARGUED]
Office of United States Attorney
Federal Building
1201 Market Street
P. O. Box 2046, Suite 1100
Wilmington, DE 19899-2046
Counsel for Appellee
United States of America

Peter Goldberger, Esq. [ARGUED]
Law Office of Peter Goldberger
50 Rittenhouse Place
Ardmore, PA 19003-2276
Counsel for Appellants
Eastern Medical Billing, Inc.
(No. 99-5489)
 and
David Podlaseck (No. 99-5491)

Raymond M. Radulski, Esq.
 [ARGUED]
Suite 301
1225 North King Street
Legal Arts Building
Wilmington, DE 19801
Counsel for Appellant
Joseph Podlaseck (No. 99-5490)

OPINION OF THE COURT

RENDELL, Circuit Judge.

In United States v. Fioravanti, 412 F.2d 407 (3d Cir.
1969), we announced a prophylactic rule prohibiting the
use of Allen charges. This appeal requires us to apply our
decision in Fioravanti and its progeny to the supplemental
charge given by the District Court during the jury's
deliberation.1 The trial resulted in guilty verdicts on all

_____

1. For the sake of clarity, we will only call a charge an Allen charge
when
the court directed the minority jurors to reconsider their views in light

2

counts against the three defendants: the Podlasecks, father Joseph and son David, and Eastern Medical Billing, Inc. ("EMB"). Since we believe that the supplemental charge contravened our precedent, and had definite potential for coercive effect on the jury, we will REVERSE and REMAND for a new trial.[2]

I.

David Podlaseck was president of EMB, a company the Podlasecks started in 1992 to provide billing services for health care providers. David's father, Joseph Podlaseck, was EMB's primary salesman, and David's mother, Phyllis Podlaseck, was its treasurer and office manager. In October 1993, EMB entered into a contract with Metro Ambulance ("Metro"), whereby EMB would provide billing services for Metro, an authorized Medicare and Medicaid provider of ambulance services, which regularly transported dialysis patients to renal care centers using ambulances and vans. Metro, its principal, Jane Pflumm, and employee Jerry Johnson, were also indicted by the grand jury, and they pled guilty to the charges.

The defendants were charged with: one count of conspiracy in violation of 18 U.S.C. S 371; eleven counts of submitting false claims to the Health Care Financing

_____

of their disagreement with the majority. Cf. Black's Law Dictionary 74–75 (6th ed. 1990) (defining "Allen charge" to encompass all instructions given to a deadlocked jury). Otherwise, we will refer to charges as the "original" or "initial" instruction or charge or as a "supplemental" charge
if it was the court's second instruction.

2. The 1999 trial was the second trial. The Podlasecks and EMB were first tried in 1997 and found guilty. However, the District Court granted their motion for a new trial after the defendants' post-trial motion raised
concerns that jurors had engaged in pre-deliberation. We affirmed the District Court's decision in an unpublished opinion. See United States v. Eastern Medical Billing, Inc., 168 F.3d 480 (3d Cir. 1998) (table) (No. 98–
7101).

Since we dispose of this appeal based solely on the supplemental charge given during jury deliberations, we need not reach the remaining issues raised by the defendants. The defendants have been released on bail pending our decision.

Administration ("HCFA") of the Department of Health and Human Services, in violation of 18 U.S.C. S 287; and four counts of mail fraud, in violation of 18 U.S.C.S 1341. The factual basis for each count was the government's contention that the defendants agreed to, and knowingly did, submit false claims to HCFA for single passenger, medically necessary ambulance trips. In fact, groups of patients had been transported together in vans, not ambulances, and the use of ambulances had not been medically necessary.

At trial, the government presented witnesses and documents to demonstrate that the Podlasecks had the necessary intent and knowledge to violate the law. The government focused especially on the meaning of certain coded run sheets that Metro drivers completed for each patient they transported, the form of which the Podlasecks had modified during the course of the allegedly illegal activity. Witnesses also testified about the Podlasecks' actions and about certain statements they made. Neither Jane Pflumm nor Jerry Johnson were called to testify.

The Podlasecks argued that they acted as dupes of Metro, and challenged the honesty and accuracy of the government's witnesses at trial. One of the principal witnesses, Angela DeFelice, who testified on behalf of the government, was attacked as being essentially dishonest and biased.[3] Other witnesses were similarly impeached.[4]

_____

3. Angela DeFelice was a data entry person at EMB hired to service the Metro account. DeFelice testified that when she began working at EMB she was told not to bill van trips, but that in October or November of 1993 Joseph Podlaseck told her that Metro had been certified by Medicaid to provide van transport. DeFelice also testified that she was contacted by client Steve Betze who complained that a van trip he took had been billed incorrectly as an ambulance trip. DeFelice said she investigated the incident and told David Podlaseck, but David told her to either continue billing in the same way or to tell Betze that he could pay the $75 fee himself. DeFelice said she also raised the matter with Joseph Podlaseck and Joseph told her to do as David had said. Two months later, DeFelice contacted the police. At trial, the Podlasecks challenged her testimony, pointing out that she went to the police after EMB fired her, and introducing a character witness who testified that DeFelice was known in her community as being dishonest.

4. Lori Cubbage, a Metro employee, testified that in October or November

4

Joseph Podlaseck also testified, and in its ruling on post-trial motions, the District Court sustained the verdict based in part on its view that Podlaseck's testimony lacked credibility. In light of the predominantly circumstantial nature of the evidence, the credibility issues on both sides, and the absence of testimony from the principal Metro officers directly involved in the offense conduct, we do not believe that the evidence at trial was "overwhelming."

Following nine days of testimony, the jury commenced deliberations on a Tuesday. After two days of deliberations, on Thursday morning, the panel submitted a question: "Can the jury be `hung' on one defendant of the indictment and not the others?" One of the prosecutors mentioned the possibility of giving an Allen charge, but defense counsel and the Assistant United States Attorney agreed with the District Court's decision to simply write "yes" on the jury

_____

of 1993, she overheard a conversation between Pflumm and Joseph Podlaseck, in which Pflumm gave Joseph Podlaseck old van billing sheets and he told Pflumm that he would "run them through as units." The government used this testimony to corroborate DeFelice's testimony, and as evidence that Joseph knew that he was billing van trips illegally and reached an agreement with Metro to do so. The Podlasecks questioned Cubbage's testimony by pointing out that she had been fired by Metro, ostensibly because Pflumm believed she had stolen money from a Metro checking account, and by questioning whether her testimony was consistent with what she had told the FBI four months after leaving Metro. The Podlasecks also pointed out that the government presented no evidence showing that the van sheets Cubbage spoke about were ever taken to EMB or entered into the computer. DeFelice testified on cross-examination that she did not remember receiving an unusually large stack of run sheets.

Similarly, Roberta Brooks, another Metro employee, testified that she asked Joseph Podlaseck how they were getting paid for the van trips and Podlaseck said that "We just do." Brooks said on cross-examination that she understood Podlaseck to be saying that he made the vans look like ambulances. However, she agreed that in her testimony to the grand jury she had said that she understood Podlaseck to be saying that he made the destinations look like hospitals rather than dialysis centers. Brooks also agreed that she had not mentioned this conversation at all in her initial interview with the FBI. She explained that the actions of Metro had been the focus of the interview.

5

note, which it did. Within one-half hour, the jury communicated a second question to the Court: "As a follow-up to the above question, is it also possible for the jury to be `hung' on one of the counts for a particular defendant and not on the other counts?"[5]

The Court asked counsel whether an Allen charge might be appropriate at this time. After a moment to consult with each other, defense counsel initially concluded that an Allen charge should be given, explaining to the Court that simply answering the question "yes" might be coercive. The Assistant United States Attorney disagreed, but said he would not oppose it vigorously. The District Court decided to give the charge. Defense counsel then asked what charge the Court would give. The Court answered: "The one I've been doing for 15 years and the one that has been approved. Why don't you look at it?" Acknowledging the Court's view that the charge had been approved, the government dropped its objection: "Your Honor, if it's the one you've been giving for 15 years, we're not going to oppose it." However, after reviewing the charge, defense counsel changed their position. Counsel for David Podlaseck and EMB explained the defendants' concern.

> Counsel: Your Honor, I'm reversing my decision because there's, of course, in the courthouse various Allen charges and I didn't remember the Court's specific Allen charge, and I understand it's been approved. What I'm worried about is that it's a long Allen charge and then I think that it will sound at this stage, given the length of it, that it's kind of telling them that they have to reach a verdict.

The Court disagreed, noted counsel's objection, and rejected counsel's subsequent proffer of a different, shorter, Allen charge.

> The Court: I don't think so. Okay. That's the difference. Eventually what I tell them is don't surrender your conscientious views.

---

5. The parties to the appeal were not privy to the content of the second instruction when they briefed and argued the case, as its content was not read into the record. The Court retrieved the question from the District Court.

Counsel: But --

The Court: Well, that's all right. You're on record, you object to it. I'm going to give it and your objection is on the record. You are protected.

Counsel: And you Honor, I in fact had someone run back to my office to propose perhaps a possible alternative instruction. And I take it that the Court is not going to consider it?

The Court: Yes, I'm going to give this one I have given repeatedly.

Counsel: I do have a shortened version.

The Court: I'm going to give this one.

Counsel: Okay.

The Court then brought the jury into the courtroom, and addressed them. We quote the instruction in its entirety.

In response to your last question, the answer is yes. I want to read you another charge.

The Court wishes to suggest a few thoughts which you may desire to consider in your deliberation along with the evidence and the instructions previously given to you.

This is an important case. The trial has been time consuming and burdensome both to the Government and to the defendants. If you should fail to agree upon a verdict, the case is left open and undecided. Like all cases, it must be disposed of sometime. There appears to be no reason to believe that another trial would not be equally time consuming and burdensome to all persons involved, nor does there appear to be any reason to believe that the case can be tried again better or more exhaustively that it has been in this trial. Any future jury must be selected in the same manner and from the same source as you have been chosen. So there appears to be no reason to believe that the case could ever be submitted to 12 men and women more intelligent, more impartial or more competent to decide it or that more or clearer evidence could be produced on behalf of either side.

7

Of course, these matters suggest themselves, upon brief reflection, to all of us who have sat through the trial. The only reason they are mentioned is because some of them may have escaped your attention which must be fully occupied up to this time in reviewing the evidence of the case. They are matters which, along with other and perhaps more obvious ones, remind us how important and desirable it is for you to unanimously agree upon a verdict, if you can do so without violence to your individual judgment and conscience.

It is unnecessary to add that the Court does not wish any juror to surrender his or her conscientious convictions. However, it is your duty as jurors to consult with one another and to deliberate with a view to reaching an agreement, if you can do so without violence to your individual judgment. Each of you must decide the case for yourself but you should do so only after consideration of the evidence with your fellow jurors and, in the course of your deliberations, you should not hesitate to change your opinion when convinced that it is erroneous.

In order to bring 12 minds to a unanimous result, you must examine the questions submitted to you with candor and frankness and with proper deference to and regard for the opinions of each other's. That is to say, in conferring together, each of you should pay due attention and respect to the views of others and listen to each other's arguments with a disposition to reexamine your own views.

If the greater number of you are for one side, each dissenting juror ought to consider whether his or her view is a reasonable one since it makes no effective impression on the minds of so intelligent fellow jurors who bear the same responsibility, serve under sanction of the same oath and have heard the same evidence with, you may assume, the same attention and an equal desire to arrive at the truth. Also, the jurors who constitute the greater number should consider the reasons of those who take a different position to see whether there may be persuasive merit in that position.

You are not partisans; you are judges -- judges of the facts. Your sole purpose is to ascertain the truth from the evidence before you. You are the sole and exclusive judges of credibility of all the witnesses and of the weight and effect of all the evidence. In the performance of this high duty, you are at liberty to disregard any comments of both the Court and counsel, including, of course, the remarks I am now making. Remember at all times, no juror is expected to yield his conscientious conviction which you may have as to the weight and effect of the evidence and remember, also, that after full deliberation and consideration of the evidence, it is your duty to agree upon a verdict, if you can do so without violating your individual judgment and conscience.

You may conduct your deliberations as you choose but I suggest that you should now retire and carefully reconsider all the evidence bearing upon the questions before you and see whether is not possible to arrive at an unanimous verdict.

All right. That you very much, ladies and gentlemen.

(emphasis added). The jury left the courtroom at 12:14 and returned at 4:10 that afternoon with a verdict of guilty against all three defendants on all counts. The jury had deliberated for two days before the supplemental instruction. The trial had taken nine days.

II.

A.

In United States v. Allen, 164 U.S. 492 (1896), the Supreme Court found no error in a supplemental charge given to the jury which told those jurors whose view formed the minority to reconsider their views in light of the contrary views held by the majority. See id. at 501-02. The Court found the charge compatible with the jury's need to deliberate openly to achieve unanimity, explaining that "[i]t cannot be the law that each juror should not listen with deference to the arguments and with a distrust of his own

9

judgment, if he finds a large majority of the jury taking a different view of the case from what he does himself." Id. Subsequently, in Hyde and Schneider v. United States, 225 U.S. 347, 382–84 (1912), and United States v. Kawakita, 343 U.S. 717, 745 (1952), the Court found no error in two other supplemental instructions challenged as unconstitutional.[6]

However, in United States v. Jenkins, 380 U.S. 445 (1965) (per curiam), the Supreme Court granted the defendant a new trial based on the coercive effect of a supplemental instruction given by the district court. See id. at 446. The jury had declared itself unable to reach a verdict after slightly more than two hours of deliberation, and in the course of speaking to the jury, the district court stated: "You have got to reach a decision in this case." See id. The Court held that "[u]pon review of the record, we conclude that in its context and under all the circumstances the judge's statement had the coercive effect attributed to it." Id.; see also United States v. United States Gypsum Co., 438 U.S. 422, 462 (1978) (finding an ex parte conversation between the district court and the jury foreman to be grounds for reversal since the jury may have understood the court to have been requiring it to reach a dispositive verdict). In Lowenfield v. Phelps, 484 U.S. 231 (1988), the Court explained that Jenkins relied upon the Court's supervisory power over the federal courts. See id. at 239 & n.2, 240 & n.3.

In Lowenfield, the Court considered the appeal of a habeas petitioner who claimed that the state trial court's actions had coerced the jury's decision to sentence him to death in violation of his constitutional rights. During the

_____

6. In Hyde and Schneider, the Court found nothing in the record to suggest a coerced verdict. See Hyde and Schneider, 225 U.S. at 382–84. In Kawakita, the Court affirmed without discussion the ruling of the Court of Appeals for the Ninth Circuit which had found that given the context of the case and the particular effect of the instruction, the instruction did not violate the defendant's rights. See Kawakita, 343 U.S. at 744 (affirming United States v. Kawakita, 190 F.2d 506, 527–28 (9th Cir. 1951)) (explaining that the issues not addressed by the Court were either "insubstantial" or "so adequately disposed of by the Court of Appeals that we give them no notice").

sentencing phase of the murder trial, the jury deadlocked. The court polled the jury as to whether further deliberation would be helpful, and, after most of the jurors said that it would, the court gave a second instruction. Unlike Allen, the instruction did not refer to the minority jurors. Rather, the instruction simply reminded the jurors to discuss one another's views and to consider the evidence with the objective of reaching a unanimous verdict based upon each juror's individual views. See id. at 234. The Court denied the habeas relief requested, holding that "on these facts the combination of the polling of the jury and the supplemental instruction was not `coercive' in such a way as to deny petitioner any constitutional right." Id. at 241. The Court, however, also explained that: "By so holding we do not mean to be understood as saying other combinations of supplemental charges and polling might not require a different conclusion. Any criminal defendant, and especially any capital defendant, being tried by a jury is entitled to a uncoerced verdict of that body." Id.

In reaching its decision, the Court first noted that "[t]he use of a supplemental charge has long been sanctioned," id. at 237, and reaffirmed the "continuing validity of this Court's observations in Allen," explaining that "they apply with even greater force in a case such as this where the charge given, in contrast to the so-called `traditional Allen charge,' does not speak specifically to the minority jurors." Id. at 237-38. The Court also noted that "[a]ll the Federal Courts of Appeal have upheld some form of supplemental jury charge," id. at 238 n.1, and cited a number of opinions of the courts of appeals limiting the content of supplemental charges, see id.

Addressing the merits, the Court considered both the content of the instruction and the circumstances relevant to determining its impact on deliberations. The Court rejected the petitioners reliance on Jenkins because of the clear difference in the language used in the two instructions. See id. at 239. Considering the instruction's impact, the Court noted that although the jury continued deliberations for only an additional thirty minutes which might suggest the possibility of coercion, the fact that defense counsel voiced no objection to the instruction

11

"indicate[d] that the potential for coercion argued now was not apparent to one on the spot." See id. at 240. Accordingly, no habeas relief was warranted.

Although the petitioner was challenging his state court sentence and could not rely upon the Court's supervisory power over the federal courts, the Supreme Court, nonetheless, considered Jenkins and Brasfield v. United States, 272 U.S. 448 (1926), in which the Supreme Court had reversed a verdict on the basis of its supervisory power because of the Court's decision to poll the jury. In Lowenfield, the Court noted that Brasfield, although based on its supervisory powers, was nonetheless still"instructive as to the potential dangers of jury polling." See id. at 239–40 & n.3.

B.

Evolving during the period between Jenkins and Lowenfield, our precedent has relied upon our supervisory power over the district courts to develop rules governing the content of jury instructions which provide guidance to us in the resolution of this appeal. See United States v. Fioravanti, 412 F.2d 407 (3d Cir. 1969); see also United States v. Burley, 460 F.2d 998 (3d Cir. 1972). In Fioravanti, the district court concluded its instruction to the jury by explaining that the verdict must be unanimous, telling the jurors to confer respectfully with each other and to scrutinize the facts from each other's viewpoint, and admonishing the jurors not to yield their well-grounded opinions or violate their oath. See Fioravanti , 412 F.2d at 415. The trial court, however, continued:

> While undoubtedly the verdict of the jury should represent the opinion of each individual juror, it by no means follows opinions may not be changed by conferences in the jury-room. The very object of a jury system is to secure unity by comparison of these views. The jury should listen with deference to arguments of fellow-jurors and distrust of his own judgment if he finds a large majority of the jury taking a different view of the case from that what he does, himself.

Id. (emphasis in original).

12

The defendant objected to the instruction, and appealed the subsequent guilty verdict. We affirmed the verdict because the charge was integrated into the body of the main charge rather than coming as "a supplemental or dynamite charge to blast a hung jury into a verdict," and because we recognized that the charge given was similar to charges "grudgingly" approved by this Court in a previous opinion. See id. at 420.7 Nevertheless, we prohibited the future use of Allen charges, and explained that use of such a charge would, in the absence of extraordinary circumstances, constitute reversible error.

> Hereafter, in this circuit, trial judges are not to give instructions either in the main body of the charge or in the form of a supplemental charge that direct a juror to distrust his own judgment if he finds a large majority of the jurors taking a view different from his. Such an instruction will be deemed error, normally reversible error. Conceivably, in very extraordinary circumstances the error may be found so inconsequential as to avoid the necessity of reversal on appeal. But hereafter this court will not let a verdict stand which may have been influenced in any way by an Allen charge.

Id. at 420.

Fioravanti represented a watershed in our jurisprudence. Its prohibition on the use of the majority/minority instruction which was not found to be error in United States v. Allen, and its warning that the subsequent use of an Allen charge would constitute reversible error in the absence of extraordinary circumstances established strict limits on the content of the jury instructions not necessarily required by Supreme Court precedent. See United States v. United States Gypsum Co., 550 F.2d 115, 131 n.4 (3d Cir. 1977) (Adams, J., concurring) (noting that Fioravanti supersedes the instruction approved in Allen), aff 'd, 438 U.S. 422 (1978). Our decision did not consider the issue as a matter of constitutional law; rather, as we explained in a subsequent opinion, we grounded our rule in our supervisory authority over the district courts and

_____

7. See United States v. Meisch, 370 F.2d 768 (3d Cir. 1966); Shaffman v. United States, 289 F. 370 (3d Cir. 1923).

13

justified our use of that power as a response to "the inherent potential of the charge to coerce" as well as "the inscrutable problem of determining in each case whether such coercion actually existed." Gov't of the Virgin Islands v. Hernandez, 476 F.2d 791, 792 (3d Cir. 1973) (emphasis added). In Fioravanti, we recognized the practical problems raised by attempting to determine whether coercion occurred in each case, and called Allen charges "an invitation for perennial appellate review." Thus, we described our rule as "a prophylactic device to eliminate future vexation." See Fioravanti, 412 F.2d at 420.

Also at play in our ruling was the belief that the justifications proffered in favor of Allen charges were outweighed by their potential to distort the workings of the jury system. Although efficient judicial administration clearly favors verdicts over hung juries, we pointed out that the "possibility of a hung jury is as much a part of our jury unanimity schema as are verdicts of guilty or not guilty." Id. at 416. We also addressed the claim that Allen charges were justified by their ability to discourage a minority of jurors from wantonly impeding deliberations by exploring its potential negative impact of the charge on the jury's deliberations. First, we recognized that the charge tends to endow the majority of jurors with the imprimatur of the court. See id. at 417. Second, we concluded that the charge served to replace the give and take of group deliberation necessary to support the requirement of jury unanimity with the influence of an early jury poll. Finally, we reasoned that the charge threatened to undermine the reasonable doubt standard because a minority vote changed to guilty by the coercive effect of the instruction would result in a verdict representing less than the collective view of each juror separately applying the reasonable doubt standard. See id. at 418–19 ("Under any standard other than an individual juror's determination, would not `the doubt of a single juror in the face of eleven votes for conviction [be] . . . per se unreasonable.' "). To address these concerns, we suggested alternative language for a court to use when it told jurors to continue deliberating and wanted to remind them to consult with each other during the deliberative process. Our suggested charge did not reference either the minority or the majority.

14

It is your duty, as jurors, to consult with one another, and to deliberate with a view to reaching an agreement if you can do so without violence to individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence in the case with your fellow jurors. In the course of your deliberations, do not hesitate to re-examine your own views, and change your opinion, if convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict.

Id. at 420 (quoting in part W. Mathes & E. Devitt, Federal Jury Practice and Instructions, S 79.01 (1965)).

Two years after Fioravanti, in Burley , we considered a supplemental instruction in which the district court referenced the costs and burdens of holding a second trial. See Burley, 460 F.2d at 998. We concluded that:"[t]o the dissenting juror the charge must have meant that she should consider the expense of a new trial to the government and its imposition on the time of many people as a significant factor that could and should persuade her to change her vote." Id. at 999 (emphasis added). Such concerns, we explained, are simply not relevant to a juror's duty to evaluate the evidence and the credibility of the witnesses and to vote for acquittal if reasonable doubt exists, and reversal was warranted.

Over the last three decades, we have applied our rule in Fioravanti on a number of occasions. See United States v. Graham, 758 F.2d 879 (3d Cir. 1985); Gov't of the Virgin Islands v. Geareau, 502 F.2d 914 (3d Cir. 1974); Hernandez, 476 F.2d at 791; United States v. Alper, 449 F.2d 1223 (3d Cir. 1971). In two cases we concluded that the content of the instruction at issue did not warrant reversal because there was no potential for coercive effect. See Geareau, 502 F.2d at 935-36; Alper, 449 F.2d at 1233. In Alper, we upheld a jury verdict rendered after the district court read a supplemental charge containing the language we approved in Fioravanti, with an additional sentence explaining that remaining deadlocked was an acceptable

15

result. See Alper, 449 F.2d at 1233. In Geareau, we simply concluded that the charge -- which was not reproduced in our opinion, but which we characterized as "simply a statement that jurors were not required to reach a verdict but should try to do so" -- was not coercive. See Geareau, 502 F.2d at 935-36.

In 1973, in Hernandez, decided after Alper and before Geareau, we reversed the convictions of two defendants because an Allen charge was given as part of the trial court's original jury instructions. See Hernandez, 476 F.2d at 793. During the court's opening instruction, it twice told the jury that if disagreement arose during deliberations, the jurors in the minority should be willing to reexamine and reevaluate their ideas and exchange their views with the thoughts of those jurors who constituted the majority. See id.[8] Finding no "extraordinary circumstances" because the evidence was not "overwhelming," we reversed on the basis of Fioravanti. See id. at 793 & n.2. We did so even though the defendants had not objected to the charge at trial, see id. at 793 ("[A]lthough no objection was made to the charge at trial, we find plain error and reverse the convictions on this ground."), and even though the charge had been part of the original instruction, not the court's later response to a deadlocked jury.

Although we have not reversed a jury verdict on the basis of Fioravanti since Hernandez, we have cited Fioravanti favorably in several recent opinions. See Graham , 758 F.2d

_____

8. We quoted the relevant portion of the court's instruction:

> If there is disagreement as to the innocence or guilt of both defendants, or either one of them, those in the minority should be willing to reexamine and reevaluate their ideas and exchange their views with the thoughts of those jurors who constitute the majority.

> The same can be said for a disagreement as to whether either one or both of them are guilty of the lesser included offense or guilty of the offense charged in the information. If there is disagreement as to which one it is, again, those in the minority ought to be willing to reexamine and reevaluate their concepts and their ideas with those in the majority to the end that unanimity might be obtained and a verdict returned.

Hernandez, 476 F.2d at 792.

at 883; see also United States v. Price, 13 F.3d 711, 724 (3d Cir. 1994); United States v. Fiorilla, 850 F.2d 172, 173-74 (3d Cir. 1988).9 In Graham , we examined an Allen charge given as part of a supplemental instruction directing the minority to reconsider their own views, and, although in confusing language, also directed the majority, if for conviction, to seriously and thoughtfully reconsider their views if a "lesser number . . . are for acquittal."10 Graham, 758 F.2d at 882. We stated that "[i]n principle, if not in terms, the charge given in this case cannot be distinguished from the Allen charge which we have rejected. It thus offends our Fioravanti decision and should not have

_____

9. In Price, we found no plain error in the district court's failure to instruct a jury that it might return as a hung jury when it responded to the questions by the jury. See Price, 13 F.3d at 725. We did not explain what the jury had asked, but wrote "[t]here may be occasions where such an instruction might be necessary, such as in conjunction with the modified Allen instruction prescribed in United States v. Fioravanti." Id. In Fiorilla, we considered an appeal from a verdict rendered after the district court required further deliberations because one of the jurors told the court during a post-verdict jury poll that he or she had not agreed with the verdict. See Fiorilla, 850 F.2d at 173-74. In passing, we noted that the Court reread to that juror the "portion of the charge to the jury referring to a juror's obligation to deliberate with a view to reaching an agreement, consistent with language approved by this Court in United States v. Fioravanti." See id.

10. In Graham, the district court told the jury:

> If much the greater number of you are for a conviction, each discenting [sic] juror ought to consider whether a doubt in his or her mind is a reasonable one, since it makes no effective impression upon the minds of so many equally honest, equally conscientious fellow jurors who bear the same responsibility, serve under the same oath, and have heard the same evidence with, we may assume, the same attention, and an equal desire to arrive at the truth.
>
> On the other hand, if a majority or even a lesser number of you are for acquittal, other jurors ought to seriously ask themselves again, and most thoughtfully, whether they do not have reason to doubt the correctness of a judgment which is not incurred [sic] in by so many of their fellow jurors, and whether they should not distrust the weight and sufficiency of evidence which fails to convince the minds of several of their jurors beyond a reasonable doubt.

Graham, 758 F.2d at 882.

17

been given." Id. at 883. We did not reverse, however, because neither defendant had raised this objection at trial and we did not view the record as warranting reversal as plain error for manifest injustice. We recognized that in Hernandez we found an instruction violating Fioravanti to constitute plain error. However, we concluded that subsequent Supreme Court precedent required us to use the plain error standard, and noted that the Hernandez decision had not analyzed the issue under the plain error standard or decided whether manifest injustice would have resulted without appellate review. See id. (citing United States v. Young, 470 U.S. 1 (1985)).11

We note that neither the Podlasecks nor the United States has focused on the precise nature of the power we exercise in reviewing charges of this nature. In Fioravanti we exercised our supervisory power, whereas in Lowenfield v. Phelps, the Court was reviewing the constitutionality of the use of the instruction at issue. Some discussion of these two distinct approaches is warranted.

We are convinced that the particular limits on the content of jury instructions created by Fioravanti and Burley and their progeny, which relied upon application of our supervisory power over the district courts, remain good law after Lowenfield, which considered whether the challenged instruction violated the state defendant's constitutional rights and reaffirmed the reasoning of Allen.12

_____

11. We are not concerned that Graham found that the "record reveals that no manifest injustice resulted from the court's instruction." Graham, 758 F.2d at 883. In Fioravanti, we affirmed the ruling on its facts. See Fioravanti, 412 F.2d at 419. Our rule simply responded to the potential for coercion an Allen charge presents, and our belief that appellate review of its impact is both imprecise and inefficient. The plain
error standard also supports Fioravanti's efficiency goal by providing defendants a strong incentive to apprise the district court of our rule when the use of the instruction can be avoided. In Graham, we explained "[h]ad any defendant here timely objected to the charge . . . the district court judge could have given a corrective instruction. Indeed, had any defendant called the court's attention to this Court's opinion in [Fioravanti], there can be no question but that the district court judge would have revamped his supplementary charge and given the proper Fioravanti instruction." Graham, 758 F.2d at 883.
12. The use of supervisory power in areas that are not clearly procedural has come under some criticism, see generally Sara Sun Beale,

18

Cf. United States v. Payner, 447 U.S. 727, 735–36 (1980) (rejecting use of supervisory powers in the context of the Fourth Amendment jurisprudence that ran contrary to Supreme Court precedent). Although the Court in Lowenfield reaffirmed its reasoning in Allen, the Court also explained that its reasoning about the deliberative process "applied with greater force" in cases where the instruction did not speak to minority jurors, see Lowenfield, 454 U.S. at 237–38, and affirmed the possibility that a coercive instruction could violate a defendant's constitutional rights, see id. at 241. Furthermore, in Lowenfield , the Supreme Court referenced rulings from each of the courts of appeals, including Fioravanti, and explained that"[a]ll of the Federal Courts of Appeal have upheld some form of a supplemental jury charge." See Lowenfield, 484 U.S. at 238 n.1 (emphasis added).13 Also cited were the decisions of the

_____

Reconsidering Supervisory Power in Criminal Cases , 84 Colum. L. Rev. 1433 (1984); Honorable Murray M. Schwartz, The Exercise of Supervisory Power by the Third Circuit Court of Appeals, 27 Vill. L. Rev. 506 (1981), and at least one judge has questioned its use in this area. See United States v. Strothers, 77 F.3d 1389, 1394–99 (D.C. Cir. 1996) (Sentelle, J., concurring). However, as Lowenfield explains, the Supreme Court relied upon its supervisory power in reversing the conviction in Jenkins. See Lowenfield, 484 U.S. at 551 n.2.

13. Other courts of appeal have taken different stances on the appropriate content of supplemental charges, and the correct form of appellate analysis. For example, in opinions also cited in Lowenfield, the Courts of Appeals for the First and Eighth Circuits established rules requiring deadlock instructions to direct both the minority and the majority to reconsider their views, to include an explanation that the jury may remain deadlocked and to remind the jury to apply the reasonable doubt standard. See Potter v. United States, 691 F.2d 1275, 1283 (8th Cir. 1982) (establishing these requirements and two others, and reversing); United States v. Anguilo, 485 F.2d 37, 39–40 (1st Cir. 1973) (citing United States v. Flannery, 451 F.2d 880, 883 (1st Cir 1971) (describing the elements of an appropriate charge"in the exercise of our supervisory powers")). Since Lowenfield, both of these courts have reversed convictions because the district court failed to address each of the required points. See United States v. Manning, 79 F.3d 212, 222 (1st Cir. 1996); United States v. Robinson, 953 F.2d 433, 436 (8th Cir. 1992) (considering both the content of the instruction and its probable effect);

19

District of Columbia Court of Appeals, United States v. Thomas, 449 F.2d 1177, 1183–86 (D.C. Cir. 1971) (en banc), and the Seventh Circuit Court of Appeals, United States v. Silvern, 484 F.2d 879, 882–83 (7th Cir. 1973) (en banc), in which those courts relied upon their supervisory power as we did in Fioravanti to prohibit the use of Allen charges and to avoid the concerns posed by case-by-case appellate review. See Lowenfield, 484 U.S. at 238 n.1; see also Thomas, 449 F.2d at 1186 ("We believe that appellate courts should no longer be burdened with the necessities and niceties -- and the concomitant uncertainties-- of gauging various Allen-type renditions in terms of the coerciveness of their impact."). Since Lowenfield, the District of Columbia Circuit has reversed convictions twice because the district court used an incorrect instruction. See United States v. Strothers, 77 F.3d 1389, 1391 (D.C. Cir. 1996); United States v. Berroa, 46 F.3d 1195, 1197 (D.C. Cir. 1995) (rejecting the invitation to reconsider Thomas because the court did not wish to engage again in case-by-case review).

We also believe that the Supreme Court's decision in Bank of Nova Scotia v. United States, 487 U.S. 250 (1988), while imposing limits on a court's ability to dismiss an indictment in the exercise of its supervisory power, does not require that we depart from our previous rulings. In Bank of Nova Scotia, the Supreme Court held that a court should

_____

see also United States v. Paniagua-Ramos, 135 F.3d 193, 197–98 (1st Cir. 1998) (stating three elements that must be present in supplemental charge and affirming district court's order granting defendant a new trial because the court failed to convey adequately the second element of the charge, i.e., that "a jury has the right to fail to agree").

More recently, in United States v. Burgos, 55 F.3d 933 (4th Cir. 1995), also decided after Lowenfield, the Court of Appeals for the Fourth Circuit reversed a jury verdict rendered after finding that the jury instruction suggested that the views held by the minority were less valuable, and adopted a rule requiring district courts to give balanced instructions, warning that an insufficiently balanced instruction would result in reversal. See id. at 941; see also Tucker v. Catoe, 221 F.3d 600, 611–13 (4th Cir. 2000) (finding instruction coercive but denying state habeas relief on other grounds).

not dismiss an indictment prior to trial as an exercise of its supervisory power based on prosecutorial misconduct in connection with grand jury proceedings unless it determined that the violation substantially influenced the grand jury's decision to indict. Id. at 256. At the heart of this ruling was the Supreme Court's concern that courts should not run roughshod over Rule 52's requirement that substantial rights be implicated in exercising "supervisory" power over the conduct of proceedings. In Bank of Nova Scotia, the Court was careful to distinguish the case before it from classes of cases in which "structural protections have been so compromised as to render the proceedings fundamentally unfair, allowing the presumption of prejudice." Id. at 257. For instance, in cases of racial or sexual discrimination in the selection of grand jurors, it could be presumed that a discriminatorily selected grand jury would treat defendants unfairly. Id. Here, we view the coercive nature of the instruction to give rise to such a presumption of coercion and unfairness. Actually, Fioravanti does include a de facto harmless error requirement, or a way of rebutting the presumption. In both Fioravanti and Burley, we presumed that an instruction containing certain content is coercive, but noted that we still should consider whether "extraordinary circumstances" cause us to conclude that reversal is not warranted because the coercive instruction did not affect the outcome. We conclude that Fioravanti is consistent with the principles set forth in Bank of Nova Scotia , and remains good law.

C.

Accordingly, our task is to consider whether the instruction given by the District Court contravened the teachings of our case law, and if so whether this case presents the type of situation that warrants reversal. Before doing so, however, we must address the government's contention that the defendants failed to preserve the objection they raise because their challenge before the District Court was directed at the instruction's length rather than its content. Our review, the government therefore argues, must be for plain error.

21

We disagree. When the District Court decided to give the instruction, it told counsel that the instruction was "approved." Defense counsel objected to the instruction because they found its length to be coercive, and sought the opportunity to present an alternative instruction. In response, the District Court curtly advised counsel that: "You're on record, you object to it. I'm going to give it and your objection is on the record. You are protected." The Court also denied the defense counsel's request for the opportunity to retrieve an alternative charge. Given the Court's assurance that the charge was approved and the objection was on the record, as well as the Court's brusque refusal to entertain further discussion, which by its tenor foreclosed further exchange and possibly further grounds for objection, we believe that defense counsel satisfactorily preserved the defendants' appeal on this issue.

The District Court's instruction addressed the views of the majority and minority of jurors despite our clear precedent indicating we should avoid a majority/minority instruction. See Fioravanti, 412 F.2d at 416–19; see also Graham, 758 F.2d at 883; Hernandez, 476 F.2d at 792–93. Furthermore, although the Court mentioned both the majority and minority jurors, the instruction clearly portrayed the minority jurors as holding less intelligent or reasonable views than the majority jurors and therefore indicated to the jurors that the views held by the minority merited reexamination. In fact, in the pivotal paragraph, the Court never instructed the majority jurors to reexamine their views. While the jurors in the majority were told simply to consider whether the minority view had "persuasive merit," the minority jurors were told to consider whether their own view was "reasonable" given that "it makes no effective impression on the minds of so intelligent fellow jurors who bear the same responsibility, serve under sanction of the same oath and have heard the same evidence with, you may assume, the same attention and an equal desire to arrive at the truth." We see no principled way to distinguish this instruction from the one we prohibited in Fioravanti, and which resulted in reversal in Hernandez.

The District Court also erred by telling the jury that another trial would be both time-consuming and

22

burdensome to all persons involved, because this portion of the instruction may have been interpreted by the jurors as complaining that if they did not agree upon a dispositive verdict, they would have wasted the Court's time and energy, and imposed upon the Court and the parties by making them endure another trial. Thus, the instruction created the potential that the jurors' deliberation was influenced by concerns irrelevant to their task in the same manner we found impermissible in Burley. See Burley, 460 F.2d at 999. The government attempts to distinguish this case from Burley because the instruction did not allude to the economic costs associated with a new trial. However, in Burley we found that the instruction referenced both the burdens and economic costs associated with another trial, and our opinion did not suggest that the combination was the pivotal factor. See id. ("To the dissenting juror the charge must have meant that she should consider the expense of a new trial to the government and its imposition on the time of many people as a significant factor that could and should persuade her to change her vote.") (emphasis added). Rather, our concern focused on the possibility that the jury reached its subsequent verdict for reasons other than the evidence presented to it. See id. ("[A] juror's responsibility is to evaluate the evidence and the credibility of witnesses and, if a reasonable doubt as to proven guilt persists, to vote for acquittal. The possibility of a hung jury and a retrial is not relevant to that determination. The jurors should not be told that this circumstance should influence them.").

We also believe it necessary to comment on the District Court's cryptic statement included at the end of the charge to the jurors that "[i]n the performance of this high duty, you are at liberty to disregard any comments of both the Court and counsel, including, of course, the remarks I am now making." This comment could be interpreted in many ways. Read in the narrow context of the preceding sentences, the Court may simply have meant that the jury was not to consider the comments of the Court and counsel as facts impacting upon the determination of guilt or innocence. Alternatively, however, the jury could have interpreted the statement as an invitation to ignore previous instructions, or even the reasonable doubt

23

standard, in pursuit of a verdict. We have not addressed a charge containing such a comment, although we have seen it elsewhere.14 Since we reverse on the basis of Fioravanti and Burley, we need not address the point further; nonetheless, we would expect that trial courts will take care in the future to avoid comments that are not clear and that could be interpreted to alter the instructions previously given to the jury.

Both parties contend that there is a striking similarity between the instruction given by the Court in this case and the model instruction provided in many editions of the Mathes and Devitt/Devitt and Blackmar, Federal Jury Practice and Instructions, treatise. See, e.g., W. Mathes & E. Devitt, Federal Jury Practice and Instructions , S 79.08 (1965).15 The defendants hypothesize that the District Court thought the charge was "approved" because it appeared in the treatise. The government argues that we "preferred" the charge in Fioravanti and Hernandez. We take this opportunity to clarify the apparent confusion. In Fioravanti, we suggested that a district court wishing to instruct jurors to consult with each other should use the language we quoted from S 79.01 of the 1965 edition of the Mathes and Devitt treatise, sandwiched between two shorter paragraphs telling the jury that the verdict must be unanimous and that their role is to act as judges of the facts. See Fioravanti, 412 F.2d at 420 n.32. In Hernandez, we reiterated this suggestion, and noted that the same language now appeared in S 17.05 of the 1970 edition. See Hernandez, 476 F.2d at 793 & n.3. In both editions, the language appeared in identical sections titled,"Verdict– Unanimous–Duty to Deliberate." See 1 E. Devitt & C. Blackmar, Federal Jury Practice and Instructions , S 17.05 (2d. ed. 1970); W. Mathes & E. Devitt, Federal Jury Practice and Instructions, S 79.01 (1965). In contrast, the instruction the parties allude to appears in a different section titled "Supplemental Instruction –– When Jurors Fail Seasonably

_____

14. See, e.g., W. Mathes & E. Devitt, Federal Jury Practice and Instructions, S 79.08 (1965); see also Kawakita, 190 F.2d at 551 n.1.

15. The only substantial difference between it and the instruction given by the District Court was the additional instruction to the majority jurors to see whether the minority view had "persuasive merit."

24

to Agree," which also appeared in both editions. See W. Mathes & E. Devitt, Federal Jury Practice and Instructions, S 79.08 (1965). Since 1977, every edition of the treatise has explained that the instruction provided in this section should not be given in the courts of the Third Circuit because of our decision in Fioravanti. See, e.g., 1 E. Devitt & C. Blackmar, Federal Jury Practice and Instructions, S 18.14 (3d ed. 1977) (explaining that "[t]his form of the charge should not be used in circuits where the court of appeals has shown express disapproval" and citing Fioravanti).

Lastly, we have examined the instruction given, in context, and conclude that there are no circumstances that would rebut the presumption of coercion so as to render the charge harmless. As we noted at the outset, the evidence presented at trial was not "overwhelming." See Hernandez, 476 F.2d at 793 & n.2 (explaining that "overwhelming" evidence of guilt might create the type of circumstance where affirmance would be appropriate in a case where the Allen charge appeared in the original instruction). Nor does the fact that the jury deliberated for an additional four hours after the instruction was given dispel the coercive effect or establish the "very extraordinary circumstances" by which Fioravanti explained "the error may be found so inconsequential as to avoid the necessity of reversal." See Fioravanti, 412 F.2d at 420. Rather, the coercive content of the instruction, the nature of the evidence presented, and the time at which the instruction was given, considered together, lead us to conclude that the error was not harmless.

We recognize that when faced with a deadlocked jury, a district court may, in its discretion, provide further instruction to the jurors. In doing so, however, the court should do no more than encourage the jurors to fulfill their duty, and possibly draw their attention again to the same rules governing their task that were explained to them during the original instruction. In this case, the District Court's instruction, given after two days of deliberation, drew the jurors' attention to issues irrelevant to their task and returned them to the jury room with the thought that the Court believed that the views held by the majority of the

25

jurors were more reasonable, and the knowledge that continued deadlock would unnecessarily burden the Court and the parties. We conclude that, in this context, such an instruction is impermissible under our precedent.

Accordingly, we hold that the instruction was an abuse of discretion requiring the reversal of the guilty verdicts rendered against all three defendants on all the counts.

In light of the foregoing, we will REVERSE and REMAND for a new trial.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

26